The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANTHONY PELAYO,<br>a/k/a Raymond Jones,<br><br>Defendant. | NO. CR18-217 JCC<br><br>UNITED STATES' SENTENCING MEMORANDUM |

For the three years between 2016 and 2019, Anthony Pelayo was one of the most prolific drug traffickers in Western Washington. Mr. Pelayo and co-conspirator Bradley Woolard knowingly and intentionally manufactured, distributed, and conspired to distribute, millions of fentanyl and furanyl-fentanyl-laced, imitation oxycodone pills, each of which carried a potential death sentence for the user who consumed it. Even though their profits were mind-boggling, Mr. Pelayo could not get enough, bragging, "I'll never quit," knowing full well the dangers he was inflicting on others. The enormity of his offense is such that his Guidelines range is something rarely seen in this Court: life in prison.

Notwithstanding this range, the government, after considering the factors set forth in 18 U.S.C. § 3553, recommends the Court impose a sentence well short of life: 300 months (25 years) confinement, as well as a five-year term of supervised release, a fine of one million dollars ($1,000,000), and the $100 penalty assessment per count (for a total of

United States' Sentencing Memorandum
*United States v. Pelayo*, CR18-217 JCC – 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

$1,900).

I.  **Guidelines Calculations**

Mr. Pelayo's Guidelines ranges in life in prison, calculated as follows:

A.  **Summary**

The government concurs with the Probation Office's grouping of Mr. Pelayo's Guidelines and total offense level (*see* PSR ¶¶ 33-62) as follows:

**Group 1 - Counts 1, 28 & 29 (drug trafficking charges):**

| | |
|---|---|
| Base Offense Level (USSG § 2D1.1(c)(1)) | **36** |
| Misrepresenting or marketing fentanyl/analogues as another substance (USSG § 2D1.1(b)(13)) | **+4** |
| Aggravating role; directly involved in importation; crime as a livelihood (USSG § 2D1.1(b)(16)) | **+2** |
| Organizer/leader role in the offense (USSG § 3B1.1(a)) | **+4** |
| **Adjusted offense level for drug trafficking offenses** | **46** |

**Group 2 – Counts 13, 18-20, 24-27, 35-38, 43-45 (money laundering charges)**

| | |
|---|---|
| Base offense level (USSG §§ 2S1.1(a)(2), 2B1.1) | **20** |
| Knowledge that laundered funds were proceeds of drug trafficking (USSG § 2S1.1(b)(1) | **+2** |
| Sophisticated laundering (USSG § 2S1.1(b)(3)) | **+2** |
| **Adjusted offense level for money laundering offenses** | **30** |

Because the adjusted offense level for the drug trafficking charges is more than nine levels higher than the adjusted offense level for the money laundering charges, Mr. Pelayo's **total offense level** is **46**. USSG § 3D1.4(c).

United States' Sentencing Memorandum
*United States v. Pelayo*, CR18-217 JCC – 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Mr. Pelayo was convicted of a DUI in 2003 and of felony VUCSA (Violation with Intent to Manufacture or Deliver Marijuana) in 2007, neither of which scores due to the passage of time. PSR ¶¶ 65-66. Accordingly, his criminal history category (CHC) is **I**.

The highest offense level in the Sentencing Table is 43. Because Mr. Pelayo's total offense level of 46 exceeds that level, for purposes of the Sentencing Table, Mr. Pelayo's total offense level is treated as 43. Based upon a total offense level of 43, and a CHC of I, Mr. Pelayo's advisory Guidelines range is life imprisonment. PSR ¶ 102.

Because group 2 (the money laundering offenses) does not affect Mr. Pelayo's offense level calculation, the Government will primarily address the provisions that pertain to group 1 (the drug trafficking offenses).

### B. Application of Guidelines to Drug Convictions

#### 1. Base Offense Level

The Probation Department properly calculated the base offense level as 36. In determining that starting point, this Court is not bound by the jury's finding as to drug weight for purposes of the statutory mandatory minimum. Rather, the Court may consider *all* relevant conduct of the defendant's and his co-conspirators, pursuant to USSG § 1B1.3(a)(2). *See* USSG § 2D1.1, Application Note 5. For purposes of determining relevant conduct in a conspiracy case such as this, the Sentencing Guidelines state that the sentencing court should consider the following:

(1)(B)  in the case of jointly undertaken criminal activity . . . all acts and omissions of others that were --

    (i)    within the scope of the jointly undertaken criminal activity
    (ii)    in furtherance of that criminal activity, and
    (iii)    reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

USSG § 1B.1.3(a)

United States' Sentencing Memorandum
*United States v. Pelayo*, CR18-217 JCC – 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Moreover, where the amount of drugs seized from the defendant's home (or seized in total in this conspiracy) "does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." Application Note 5, USSG § 2D1.1.

Here, investigators seized significant quantities of drugs from co-conspirators: 17,166 furanyl-fentanyl-laced imitation oxycodone pills; 417.2 net grams of furanyl fentanyl powder;[1] and 542 net grams of fentanyl powder. *See* Pl. Ex. 33 (filed herewith as Exhibit A). But for law enforcement's seizure of the furanyl fentanyl powder and fentanyl powder, those deadly powders would have been distributed into the community.

Yet as significant as those seizures were, they do not reflect the scale of Mr. Pelayo's offenses. Those seizures occurred on six days in the summer of 2018 and in the spring of 2019 – yet the pressing and distribution of the pills began in early 2016 and continued for years thereafter.[2]

Mr. Pelayo's stored communications and witness testimony established that Mr. Pelayo distributed pills at a wholesale level to codefendant Jerome Isham. Stored communications show that between July 2017 and June 2018, Mr. Isham ordered 954 "packs" (of one hundred pills each) from Mr. Pelayo (Pl. Ex. 1021). The government's summary chart (shown in closing) show that Mr. Pelayo's orders from Mr. Isham totaled 95,400 pills. *See* Exhibit A. But again, this figure is a significant undercount of the

---

[1] These seizures include the intercepted parcels of furanyl fentanyl mailed to Sadie Bates (two parcels), and the intercepted parcels mailed to Jessie Simmons and Adrian Bergstrom.

The co-conspirators could manufacture thousands of pills with just a few grams of furanyl fentanyl. On or about April 27, 2016, Mr. Woolard emailed the Chinese source of supply that, "we use the fu-f in a pill so the three grams is like 2000 pills." *See* Pl. Ex. 667 at p. 1. Thus, using the co-conspirators' formula, 417.2 net grams of furanyl fentanyl could be turned into 278,133 pills.

[2] The members of the conspiracy did experience a temporary dry spell in approximately May of 2018, due to an interruption in their supply from China. As Mr. Pelayo wrote to Mr. Isham on May 22, 2018, "Man we on hold rn [right now] we finally ran out after two years I'm hoping to know more soon here I'll keep you posted." Pl. Ex. 1021 at p. 19.

United States' Sentencing Memorandum
*United States v. Pelayo*, CR18-217 JCC – 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

quantity of drugs reasonably foreseeable to Mr. Pelayo as one of the leaders of this conspiracy.

The evidence at trial showed that Bradley Woolard dreamt up the scheme to make millions pressing the fentanyl-laced imitation oxycodone pills, and Mr. Pelayo was his right-hand man from the beginning. Mr. Pelayo assisted Mr. Woolard in pressing the pills; when Mr. Woolard went to the Holistic Sanctuary in Mexico in January of 2017, the pressing operation was relocated to Mr. Pelayo's property at Russian Road in Arlington, Washington. *See* Pl. Exs. 684, 687, 906, 982, 1021. The presses used by Mr. Woolard and Mr. Pelayo were capable of pressing thousands of pills an hour, and Mr. Woolard and Mr. Pelayo pressed so many pills over the course of the conspiracy that they wore out multiple presses. Mr. Pelayo was involved in efforts to obtain and operate a ZP7 pill press, which was capable of manufacturing pills more quickly than a TDP-5 press. Mr. Pelayo was also involved in the recruitment of individuals to accept parcels of drugs shipped from China. And Mr. Pelayo's stored communications show that he also understood that Mr. Woolard was also recruiting other people, such as Keith Strand and Danette Skelton, to accept the parcels of drugs. Mr. Pelayo also directed codefendant Robert Tabares to send multiple Western Union wires to China to pay for the drugs, and he was also involved in looking for Bitcoin to use to pay the Chinese source as well.

Due to the centrality of his role in the conspiracy, and his knowledge of the pill pressing and distribution operation, the most accurate approximation of the weight of the pills distributed by the conspiracy is more than 320 kilograms of fentanyl-laced pills. This figure is based upon the documented purchases of inactive ingredients used in the pills, along with the weight of the fentanyl and furanyl fentanyl shipped by the Chinese sources of supply shipped to members of the conspiracy. *See* Pl. Exs. 34, 38. This would result in a base offense level of 38. Whether his base offense level is 36 or 38, his total offense level would still result in a Guidelines range of life imprisonment.

United States' Sentencing Memorandum
*United States v. Pelayo*, CR18-217 JCC – 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### 2. Misrepresenting or marketing fentanyl/analogues as another Substance (USSG § 2D1.1(b)(13))

The evidence at trial showed that Pelayo "knowingly misrepresented" and "knowingly marketed" fentanyl and furnayl fentanyl as prescription opioids. This evidence included:

Mr. Pelayo sought to obtain dies for a ZP7 pill press to stamp pills "M30," and dies for a TDP-5 pill press to stamp pills "G3722"; these are markings for pharmacy-supplied oxycodone pills. *See* Pl. Ex. 955 at pp. 3-26. Mr. Pelayo knew that the pills that he was pressing and distributing were colored and stamped in a manner consistent with pharmaceutically obtained oxycodone pills – and he knew they contained fentanyl, not oxycodone. He also knew that those pills were colored and stamped to make them appear, misleadingly, as oxycodone pills.

Pelayo repeatedly discussed how his pills were "dummies," as opposed to "reals." For example, while recounting one drug deal with Andrew Tong about the pressed pills (the "dummies"), Mr. Pelayo texted that "the dummies get u fucked up its just a different active ingredient," "They actually stronger," and "But don't last as long and u can't smoke it." *See* Pl. Ex. 938 at p. 5. Mr. Pelayo also texted, "they not the real ones they look like em but they just have diff ingredients." *Id.* at p. 6. And during Mr. Pelayo's attempts to recruit Mr. Tong to sell the pills for him, Mr. Tong asked him, "What's the real name for it" and "Like what's it mostly made of," to which Mr. Pelayo responded, "Just tell em they percs" [Percocets]. *Id.* at p. 26.

Pelayo even joked how the pills he was selling could put people in the hospital. On one occasion, when Tong jokingly texted Mr. Pelayo, "We bout to get fucked up on synthetics when I come up there," [referring to consuming the pills], Mr. Pelayo replied, "Wth [what the hell] I ain't lol," "These thing to craY bro," [too crazy] and "B goin to the hospital lol." *Id.* at pp. 14-15.

United States' Sentencing Memorandum
*United States v. Pelayo*, CR18-217 JCC – 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

His co-conspirators tried to warn Pelayo about these dangers, which he brushed off. Tabares sent Pelayo links to Pelayo including articles and a video describing the dangers of fentanyl and its analogues. *See also* Pl. Ex. 1025 at p. 1 (link to *Seattle Times* article regarding "deadly synthetic opioids"), p. 2 (referring to kiro7 news story about furanyl fentanyl, which was "so potent you can die from touching it"), and p. 5 (video regarding importation of drugs from China in the mail); 1025.1 at p. 8 (post re: kiro7 story); 1025.2 (*Seattle Times* article regarding lethal fentanyl-type opioids imported from China); 1025.7 (video). Mr. Pelayo's response to the video was simply to inquire, "Ya did they have more info like how they noticed it." Pl. Ex. 1025 at p. 5. In other words, Mr. Pelayo only wondered how the drug dealers had been caught.

### 3. Involvement in Importation (USSG § 2D1.1(b)(16)(C))

Mr. Pelayo was directly involved in recruiting others to accept parcels of fentanyl imported from China. For example:

- On January 9, 2018, Mr. Woolard texted Mr. Pelayo that the source of supply needed more addresses to receive packages due to a change in U.S. Customs, to which Mr. Pelayo said, "Ok so 1 more address that can receive 2 package[s]." *See* Pl. Ex. 1021 at pp. 9-10. On January 11, 2018, Pelayo texted a third party (UT7395), "Hey we need to find another address to send 2 packages," "Did u ask ur people," and "Well let me kno the address it's 500 a package." *See* Pl. Ex. 997. The next day, UT7395 texted, "6512 Berkshire drive 98203 Everett wa." *Id.* On or about January 14, 2018, Mr. Woolard provided the Berkshire Drive address to the Chinese source of supply; emails indicate the source of supply shipped three parcels of 125g of fentanyl to the Berkshire Drive address. *See* Pl. Ex. 38, 773, 776.

- During the above discussions in January 2018, Mr. Pelayo, hoping to expand the operation to Mexico, asked Mr. Woolard, "Wil she send to Mexico," "We should try to send a small package over there I pretty sure I can get it over," "U should ask her if it's easier to send bigger packages to Mexico," and "For future orders obviously." *See* Pl. Ex. 1021 at p. 10. Mr. Woolard made the inquiry of the Chinese source of supply, who advised that they did not ship to Mexico. *See* Pl. Ex. 772.

United States' Sentencing Memorandum
*United States v. Pelayo*, CR18-217 JCC – 7

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

- On March 27, 2018, Mr. Pelayo texted Mr. Woolard, "I'm working on more addresses." *See* Pl. Ex. 1021 at p. 14.

- On or about May 7, 2018, Mr. Woolard emailed the Chinese source of supply that he did not want "unit B"; he wanted "unit 1," (fentanyl). Mr. Woolard told the source that he would pay extra to manufacture fentanyl specially for him, confirming that he would pay $40,000 for the source to manufacture two kilograms of fentanyl powder for him, noting that he wished the source could deliver ten kilograms, but two would get him by for a while. *See* Pl. Ex. 787-789. Mr. Woolard kept Mr. Pelayo appraised of these discussions with the source. For example, on May 7, 2018, Mr. Woolard, using very thinly veiled code, texted Mr. Pelayo, "I want to keep track of our parts who gets what. I'm having to pay the factory extra to make our bolts. They wanted to change the brand of metal but I said no I'll pay extra. Anyway we should chat." *See* Pl. Ex. 1021 at p. 16. Mr. Pelayo explained that he would get a "new address from that guy and I'll ask for the other one when I see the guy." *See* Pl. Ex. 1021 at p. 16. On May 9, 2018, Mr. Pelayo texted Mr. Isham, "Yo imma need that address," which the two went on to discuss. *Id.* That same day, Mr. Isham texted Sadies Bates' name and address to Mr. Pelayo. *Id.* Mr. Pelayo told Mr. Isham, "Ok koo try and find a couple more to," to which Mr. Isham responded, "Aight aight." *Id.* Mr. Isham went on to recruit Jessie Simmons. *See* Pl. Ex. 874.

- When the parcel of drugs was delivered to Ms. Bates, Mr. Pelayo directed Mr. Isham to get the parcel as soon as possible because they needed the package to make an order. *See* Pl. Ex. 1021 at 22. Mr. Pelayo instructed, "Ya go handle that bro if u gotta kick her door open do it," and "She fuxking up the money rn what if she opened it and tried some she would literally die." *Id.* at pp. 22-23.

In addition, as Mr. Woolard's emails show, the Chinese source shipped a parcel to Mr. Pelayo, under his alias "Raymond Jones," at the address of Mr. Isham's marijuana grow. In an email sent on or about July 21, 2018, the Chinese source of supply wrote Mr. Woolard that, among other parcels, the first parcels to Ms. Bates and Mr. Simmons had been delivered, and a parcel addressed to "Raymond Jones" had cleared customs. *See* Pl. Ex. 820 at p. 2. In that same discussion, the Chinese source of supply explained that they

United States' Sentencing Memorandum
*United States v. Pelayo*, CR18-217 JCC – 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

had sent out 13 parcels of furanyl fentanyl instead of fentanyl and would re-process and ship Mr. Woolard's order as soon as possible.

Mr. Pelayo also repeatedly directed codefendant Robert Tabares to send money via Western Union to payees in China in order pay for the drugs. *See* Pl. Ex. 38 at p. 2. Mr. Pelayo was also actively involved in the hunt for $40,000 worth of Bitcoin to send to the Chinese source of supply to purchase two kilograms of fentanyl. Pl. Ex. 1021.

### 4. Crime as a Livelihood (USSG § 2D1.1(b)(16)(E))

Mr. Pelayo's communications with Mr. Tong leave no doubt that Mr. Pelayo's highly profitable livelihood was drug trafficking. For example:

- On January 5, 2017, Mr. Pelayo texted, "I literally can make whatever I want if I can move enough of them," and "This fool [referring to Mr. Woolard] makes like 200k a month." *See* Pl. Ex. 938 at p. 12. Two days later, Pelayo texted, "I've been crazy busy I ke barely sit down n shit trying to get this money shits bout to take off lol." *See* Pl. Ex. 938 at p. 16.

- On February 6, 2017, Mr. Pelayo texted, "Imma make a [gold] chain that looks like the dummies shits about to make me a mill lol." *See* Pl. Ex. 938 at p. 16.

- On February 10, 2017, Mr. Pelayo texted, "I had to go back to the street life bro only way for me to get this real money so now I'm just running around like crazy toting the heat lol." *See* Pl. Ex. 938 at p. 17.

- On February 23, 2017, Mr. Pelayo texted, "I'm telling u it's booming in them dummies" and "The prices r so cheap u Make hella money," and "the money is to good." *See* Pl. Ex. 938 at pp. 17, 22.

- On February 25, 2017, Mr. Pelayo texted, "I'm trying to tell you you need to get on it bro shit is too much money to be made," to which Mr. Tong replied, "Ur on a spending spree." Mr. Pelayo added, "I told you I'm gonna be a millionaire this year." *See* Pl. Ex. 938 at p. 27.

- On February 17, 2018, Mr. Pelayo texted, "Ya it's a sketchy life bro u paranoid all the time specially when u making crazy money" and sent Mr. Tong a video of cash stuffed in his kitchen drawer. *See* Pl. Ex. 938 at p. 46.

United States' Sentencing Memorandum
*United States v. Pelayo*, CR18-217 JCC – 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

- Mr. Pelayo sent multiple other videos and photos of cash to Mr. Tong as well. *See* Pl. Ex. 938 at p. 54 ("And that's 500k").

- Mr. Pelayo boasted of the many assets he purchased as a result of his pill business, including an Apple watch, a dishwasher, a John Deere tractor, and a motorcycle. *See* Pl. Ex. 938 at p. 26, 31-33, 38. The two also discussed Mr. Pelayo providing Mr. Tong with more than $100,000 in cash drug proceeds to buy a motorhome for Mr. Pelayo. *See* Pl. Ex. 938 at pp. 42-47.

- The two also discussed Mr. Pelayo's need to have a cover story to explain why he had so much money and so many assets. On February 17, 2018, Mr. Pelayo texted, "I just started telling people I'm a silent investor in a few night clubs and I get paid in cash." *See* Pl. Ex. 938 at p. 47. Mr. Tong suggested that Mr. Pelayo say that he bought bitcoin when it first started. *See* Pl. Ex. 938 at p. 48. Mr. Pelayo responded, "I have hella lies lol." *Id.* Mr. Pelayo then wrote, "The goal is to have all my houses paid off and at least 5m saved," "They said the first one is the hardest to get then it's easy," "And thats true took me 30 years to make an m [million]," and "now I can make a m quick." *See* Pl. Ex. 938 at p. 48.

Similarly, Mr. Pelayo encouraged Mr. Isham, "Embrace the new life bro," "Boss moves," and "I tried to tell y'all in the beginning this is a life changing opportunity we gonna get it." *See* Pl. Ex. 1021 at p. 18.

Mr. Pelayo expounded on his drug-trafficking business in his texts with UT5447, writing, "there's levels to this boss shit and u on a different level bro u can't be taking risks for a few bucks." *See* Pl. Ex. 999 at p. 1. Mr. Pelayo further explained, "Plus u gotta look at it like this it's all a pyramid u on top of u give all those lil people to someone else that u supply itvall [it all] comes to u anyways but u don't have to take any of the heat." *Id.* at p. 2.

### 5.   Aggravating Role (USSG §§ 2D1.1(b)(16) and 3B1.1(a))

Second only to Mr. Woolard, Mr. Pelayo was an organizer and leader of this extensive conspiracy. As someone at the top of the "pyramid," Mr. Pelayo took a cut of everyone below him that he supplied. *Id.*

United States' Sentencing Memorandum
*United States v. Pelayo*, CR18-217 JCC – 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Mr. Pelayo directed the activities of others. Mr. Pelayo directed Mr. Tabares to check the tracking on parcels shipped from China, send funds to China, purchase a powder paste mixer, and acquire inactive ingredients for the pills such as microcrystalline cellulose and lactose powder. Mr. Pelayo also directed Mr. Tabares to purchase the distinctive white boxes that had been found with pills in codefendant Griffin Thompson's car, Mr. Woolard's residence, and Mr. Isham's residence. *See* Pl. Ex. 1025, 1025.1-1025.6. Mr. Pelayo also directed the activities of codefendant Jose Feliciano Lugo, who delivered drugs and picked up parcels on Mr. Pelayo's behalf.

## II. Sentencing Recommendation

Mr. Pelayo's advisory Guidelines range is life imprisonment. Mr. Pelayo faces a statutory ten-year mandatory minimum term of imprisonment on Count 1 (21 U.S.C. § 841(b)(1)(A)). Mr. Pelayo is also facing a statutory five-year mandatory minimum term of imprisonment on Count 11 (18 U.S.C. § 924(c)), which must be imposed consecutively to the ten-year mandatory minimum term. The government is recommending a total sentence of 25 years in custody, to be followed by five years of supervised release. The government is also recommending a fine in the amount of $1,000,000; the penalty assessment totaling $1,900 is mandatory.

### A. The Nature and Circumstances of the Offenses

This Court is well-aware of Mr. Pelayo's role in the drug trafficking conspiracy: Pelayo helped press millions of fentanyl pills and was at the top of a distribution network that sent those pills throughout Western Washington. Mr. Pelayo was also convicted of conspiracy to commit money laundering, and multiple counts of substantive money laundering, for his role in directing Mr. Tabares to send money via Western Union to China to pay for the drugs.

Mr. Pelayo knew about the searches of Mr. Woolard's properties and the arrest of Mr. Isham. But even knowing that law enforcement was actively investigating the conspiracy of which he was a key member was not enough to convince Mr. Pelayo to

United States' Sentencing Memorandum
*United States v. Pelayo*, CR18-217 JCC – 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

stop committing crimes. More specifically, the first search warrant for Mr. Woolard's Arlington residence was executed on July 28, 2018. On July 29, 2018, Mr. Pelayo texted Mr. Tong, "the [main] guy got cracked yesterday" by the DEA. *See* Pl. Ex. 938 at p. 79. Mr. Tong told Mr. Pelayo, "U should move your loot ASAP," and Mr. Pelayo responded, "It's gone already" and "I was up u til 1 moving shit." *See* Pl. Ex. 938 at 80. Mr. Tong texted, "If they got the top guy" then "You would be crazy to continue," to which Mr. Pelayo responded, "lol fuxk that I'll never quit." *See* Pl. Ex. 938 at p. 82. The two went on to discuss steps Mr. Pelayo was taking to hide evidence and his assets.

On August 3, 2018, law enforcement arrested Mr. Isham. On August 4, 2018, Mr. Pelayo texted Mr. Tong, "Man it's all bad over here bro" and "Another homie down." *See* Pl. Ex. 938 at p. 87. Mr. Pelayo explained that after Mr. Pelayo helped to bail Mr. Isham out of county jail, Mr. Isham was charged federally. *See* Pl. Exs. 938 at 89; 963; *see also* Exhibit B (messages between Mr. Pelayo and Mr. Isham's wife, recovered from the iPhone located on Mr. Pelayo's person on May 30, 2019); Exhibit C (message between Mr. Pelayo and Mr. Isham's wife, recovered from the iPhone located in Mr. Pelayo's van on May 30, 2019).

On September 24, 2018, Mr. Pelayo sent Mr. Isham's wife a link to the *Seattle Times* story about the arrests of Mr. Thompson and Mr. Woolard; Mr. Pelayo instructed her to write down the name but to erase Mr. Pelayo's message. *See* Exhibit C at p. 21.

Even after Mr. Woolard's September 1, 2018, arrest, Mr. Pelayo carried on with his efforts to obtain "M30" and "G3722" pill press dies. *See* Pl. Ex. 955 at pp. 24-26. And on January 5, 2019, during an exchange between Mr. Lugo and Mr. Pelayo, Mr. Lugo wrote, "I miss brad and the old days lol," to which Mr. Pelayo replied, "Trust me I know but I do have some," indicating that Mr. Pelayo still had drugs available. *See* Pl. Ex. 944 at p. 2.

//
//

United States' Sentencing Memorandum
*United States v. Pelayo*, CR18-217 JCC – 12

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The arrests of Mr. Woolard and Mr. Isham prompted Mr. Pelayo to continue his money laundering apace, by trying to hide his assets with Mr. Tong. *See* Pl. Ex. 938 at pp. 94-104; 963; 963.1.

On May 30, 2019, investigators searched Mr. Pelayo's residence and found evidence of Mr. Pelayo's crimes and proceeds, including oxycodone pills, cash drug proceeds, scales, firearms and ammunition, and his motorcycle. When investigators searched Mr. Pelayo's home under construction at his Russian Road property, they located Mr. Pelayo's John Deere Tractor, his $100,000 motor home, and evidence of old marijuana grows. Investigators searched Mr. Pelayo's work van and found cash drug proceeds and a loaded firearm; this is the firearm that is the basis for Mr. Pelayo's conviction under 18 U.S.C. § 924(c) (Count 11).[3]

That very night, Mr. Pelayo cleared out evidence from the storage unit that he had rented using his fake Florida driver's license for "Raymond Jones." One of the items that he removed from his storage unit was the five-kilogram powder paste mixer that he had directed Mr. Tabares to purchase for him. Following the searches of his residences, Mr. Pelayo immediately went into hiding. *See* Pl. Ex. 963 at pp. 1-2.

When investigators searched Mr. Lugo's residence on June 13, 2019, they found fentanyl in powder form. That same day, Mr. Pelayo texted Mr. Tong, "Fuck man they raided my other homies house." *See* Pl. Ex. 963 at p. 7. The very next day, Mr. Pelayo and Mr. Tong discussed hiding Mr. Pelayo's money with Mr. Tong; on June 17 and 18, 2019, they transferred a total of $200,000 from Mr. Pelayo's "Pelayo and Sons LLC"

---

[3] The Government summarized the evidence establishing Mr. Pelayo's possession of this firearm in furtherance of drug trafficking in its response to Mr. Pelayo's Rule 29/Rule 33 motion. Dkt. 867.

United States' Sentencing Memorandum
*United States v. Pelayo*, CR18-217 JCC – 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

bank account at JP Morgan Chase to Mr. Tong's bank account.[4]  *See* Pl. Ex. 963 at pp. 11-15.

Mr. Pelayo knew that Mr. Tabares had been indicted and arrested, and he also knew that he had been charged in the same indictment as Mr. Tabares.  *See* Pl. Exs. 963 at pp. 6-7; 963.1.  Mr. Pelayo also knew that investigators were actively looking for him, presumably to arrest him, and that DEA agents had talked to his wife and his mother.  *See* Pl. Exs. 963 at pp. 15-18; Pl. Ex. 965 at p. 8.

But rather than turn himself in to face these charges, Mr. Pelayo continued his efforts to evade arrest.  It was only after investigators obtained a tracking warrant for his phone that they located Mr. Pelayo, conducted a traffic stop, and arrested him.  *See* Pl. Ex. 963.

**B.      The Defendant's History and Characteristics**

Mr. Pelayo is 34 years old.  Although he has disclosed a history of some drug use, he reports that both his physical and mental health are both good.  PSR ¶¶ 78, 80.  Aside from his parents' divorce, he did not report experiencing any childhood trauma.  PSR ¶¶82-84.

Although Mr. Pelayo's CHC is I, he was a drug trafficker prior to the inception of this conspiracy.  He was involved in the illegal manufacture and distribution of marijuana.  He also sold "reals," *i.e.*, pharmacy-supplied oxycodone, and his clientele included Mr. Woolard and his wife, Shawna Bruns.

Mr. Pelayo could have used his skills and abilities to earn an honest living.  But he had bigger ambitions, and he eagerly embraced the opportunity to make millions of dollars for himself, regardless of the misery he caused to others.  Mr. Pelayo appears to have no

---

[4] In all, Mr. Pelayo laundered more than $500,000 of his cash drug proceeds with Mr. Tong, including the purchase of the $103,000 RV; a $100,000 cashier's check payable to "Pelayo & Sons LLC"; multiple structured cash deposits into Pelayo's business account; multiple wire transfers into Pelayo's business bank account; and the $200,000 referenced above. See Pl. Exs. at pp. 51-60, 74-77, 97-104; *see also* Dkt. 237.

United States' Sentencing Memorandum
*United States v. Pelayo*, CR18-217 JCC – 14

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

remorse for his conduct or the deadly pills he distributed in the community. To the contrary, even though he understood full well the dangers of those pills, he cared nothing about addicts, their families, or the community. Pelayo only cared about money and the lifestyle he enjoyed off the addiction of others. As Pelayo himself stated, "The goal is to have all my houses paid off and at least 5m saved." *See* Pl. Trial Ex. 938 at p. 48. Pelayo loved these profits so much, he bragged, "I'll never quit." *Id.* at p. 82. These are his characteristics.

## C.    The Need for Deterrence

Specific deterrence is a particular concern with respect to Mr. Pelayo. As Mr. Pelayo put it, "I'll never quit." *See supra*.

A significant sentence would serve to deter other would-be drug traffickers from engaging in similar conduct

## D.    Just Punishment

The government's recommended sentence is far below the guidelines range of life in prison. This sentence gives Mr. Pelayo the opportunity to reunite with his family in middle life. Given the nature of the offenses, Mr. Pelayo's conduct, and his fervent wish to return to drug dealing the first chance he gets, this sentence is just.

## E.    Fine and Forfeiture

A significant fine is warranted.

As summarized in detail above, Mr. Pelayo made millions of dollars in profits from this conspiracy. He repeatedly told Mr. Tong how much money he was making selling "dummies," and that he could make a million dollars quickly. To emphasize the profitability of his endeavors, Mr. Pelayo repeatedly texted photos and videos of his cash drug proceeds to Mr. Tong. There is no question that Mr. Pelayo has the ability to pay a fine.

//
//

United States' Sentencing Memorandum
*United States v. Pelayo*, CR18-217 JCC – 15

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Investigators found and/or seized only a fraction of Pelayo's profits from selling fentanyl-laced pills.[5]  During the searches related to Mr. Pelayo, investigators seized Mr. Pelayo's Thor RV and $129,201 in cash drug proceeds, which have been forfeited to the United States.  Additionally, investigators seized firearms and other assets (listed below) which are presently held as evidence and not for purposes of forfeiture[6]:

| Asset | Estimated Value |
|---|---:|
| 2015 Ford Transit Connect Cargo Van | $11,375 |
| 2016 GMC Sierra 2500 Denali Pick-up Truck | $49,575 |
| 2017 Harley-Davidson FLHXS Street Glide Special Motorcycle | $16,915 |
| 1969 Oldsmobile Cutlass S Hardtop Coupe | $11,500 |
| 1986 Chevrolet Monte Carlo Super Sport Coupe | $5,250 |
| 2017 John Deere 2032R Compact Tractor and Frontier RC2060 Rotary Cutter Attachment | $18,650 |

In anticipation of requesting a significant fine at sentencing, and being mindful of judicial economy, the government elected not to pursue forfeiture of the above assets before the jury.  With Mr. Pelayo's consent, the parties could arrange to apply the assets toward any fine that the Court might impose.

## III.   CONCLUSION

Unsurprisingly, Mr. Pelayo is a wealthy man today because he had no compunction about profiting from the opioid epidemic. He has yet to show any remorse

---

[5] As noted above, Mr. Pelayo "moved his loot" immediately after law enforcement searched Mr. Woolard's residence.  Similarly, after law enforcement searched Mr. Pelayo's residences, Mr. Pelayo removed the five-kilogram powder paste mixer, and other items, from his "Raymond Jones" storage unit.

[6] The Motion for a Protective Order (dkt. 237) discuses some of Mr. Pelayo's assets. *See also* Third Notice Regarding Forfeiture (dkt. 938).

United States' Sentencing Memorandum
*United States v. Pelayo*, CR18-217 JCC – 16

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  for the harm he caused this community.  For these reasons, and for all the factors in 18
2  U.S.C. § 3553(a), the government respectfully recommends the Court impose its
3  recommended sentence.

5     Dated this 16th day of November 2021.

        Respectfully submitted,

        NICHOLAS W. BROWN
        United States Attorney

        /s/ *Karyn S. Johnson for*
        KARYN S. JOHNSON
        MIKE LANG
        Assistant United States Attorneys
        United States Attorney's Office
        700 Stewart Street, Suite 5220
        Seattle, Washington 98101-1271
        Telephone:   (206) 553-7970

United States' Sentencing Memorandum
*United States v. Pelayo*, CR18-217 JCC – 17

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970