The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANTHONY PELAYO,
a/k/a Raymond Jones,

Defendant.

NO. CR18-217 JCC

SUPPLEMENT TO UNITED STATES' SENTENCING MEMORANDUM

The government offers this response to Anthony Pelayo's sentencing memorandum (Dkt. 964).

**Eighth Amendment**

In asking this Court to disregard the mandatory minimums, Pelayo invites reversal of this Court's sentence: it is axiomatic that mandatory minimum terms of imprisonment are mandatory and do not violate the Eighth Amendment. *See, e.g.*, *United States v. Labrada-Bustamante*, 428 F.3d 1252, 1265 (9th Cir. 2005) ("Mandatory minimum sentencing schemes have been consistently upheld against constitutional challenge."); *United States v. Martinez*, 7 F.3d 146, 147 (9th Cir. 1993); *United States v. Kidder*, 869 F.2d 1328, 1334 (9th Cir. 1989); *United States v. Kinsey*, 843 F.2d 383 (9th Cir. 1988) (overruled on other grounds by *United States v. Nordby*, 225 F.3d 1053, 1059 (9th Cir. 2000)) (rejecting Eighth Amendment and Equal Protection challenges to 21 U.S.C.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

§ 841(b)).

**Drug Quantity**

It is well-established that the government must prove drug quantity by a preponderance of the evidence to determine a base offense level under the Sentencing Guidelines. *See, e.g., United States v. Culps*, 300 F.3d 1069, 1076 (9th Cir. 2002). The Ninth Circuit has held:

> A district court may approximate the amount of drugs attributable to a defendant where the amount of drugs seized by the officers 'does not reflect the scale of the offense.' U.S.S.G. § 2D1.1 cmt. 5. In making an estimate, the court may consider, among other factors, "the price generally obtained for the controlled substance, financial or other records, [and] similar transactions in controlled substances by the defendant." *Id.* Thus, a court may convert cash into drug quantities, provided there is some evidence supporting a connection between the money seized and the drug transactions. *See United States v. Otis*, 127 F.3d 829, 836 (9th Cir. 1997) (citing *United States v. Gonzalez–Sanchez*, 953 F.2d 1184 (9th Cir. 1992)).

*United States v. Gadsen*, 763 F.3d 1189, 1220 (9th Cir. 2014). The evidence summarized in the United States' Sentencing Memorandum (Dkt. 962 at pp. 3-5) and the Presentence Report more than meets the preponderance of the evidence standard.

Pelayo suggests that *United States v. Collazo*, 984 F.3d 1308 (2020) requires proof beyond a reasonable doubt for determination of a base offense level. Pelayo is wrong.

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that, other than the fact of a prior conviction, any fact that increased the prescribed *statutory* maximum term of imprisonment is an element of the offense to be found by the jury and must be proved beyond a reasonable doubt. *Alleyne v. United States*, 570 U.S. 99, 106 (2013) (discussing *Apprendi*, 530 U.S. at 490) (emphasis added). In *Alleyne*, the Supreme Court held that any fact that increases the *statutory* mandatory minimum constitutes an element of the crime that must be submitted to a jury and proved beyond a reasonable doubt. *Alleyne*, 570 U.S. at 114-15 (emphasis added). *Apprendi* and *Alleyne* do not require the jury to determine a defendant's Sentencing Guidelines range; that is the role of the



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

sentencing court. *See United States v. Rodriguez*, 851 F.3d 931, 948 (9th Cir. 2017) ("if an offense level increase under the U.S. Sentencing Guidelines does not affect the statutory maximum sentence or the mandatory minimum sentence, 'neither *Apprendi* nor *Alleyne* [] is implicated'" (quoting *United States v. Vallejos*, 742 F.3d 902, 906 (9th Cir. 2014)).

*United States v. Collazo*, 984 F.3d 1308 (2020) does not change this framework. In *Collazo*, the Court concluded that "in order to obtain a particular sentence *under § 841(b)(1)(A)(viii) and § 841(b)(1)(B)(i) for a violation of § 841(a)*, the government must prove beyond a reasonable doubt the specific type and the quantity of substance involved in the offense, but not the defendant's knowledge of (or intent) with respect to that type and quantity." *Collazo*, 984 F.3d at 1329 (emphasis added).

At trial, the jury heard defense's argument about the number of pills tested and soundly rejected it, as the verdicts show. As the forensic chemists explained, the goal of testing by DEA is to randomly sample enough of the pills to say with a 95% confidence level that 90% of the pills contained the drug at issue (here, furanyl fentanyl). The 95% level of confidence refers to a "standard deviation," *i.e.*, the scientific standard for the level of certainty needed to make sure that the observations are not based on random occurrence. The 95% level of confidence refers to a very high degree of confidence. In other words, it is not the goal of testing to test every pill.

**<u>Imposition of a Significant Fine</u>**

The Sentencing Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." USSG § 5E1.2(a). Because the jury convicted Pelayo of Count 1 at the 21 U.S.C. § 841(b)(1)(A) level, the Court may impose a sentence up to the statutory maximum for that offense, *i.e.*, $10,000,000. USSG § 5E1.2(c)(4). In determining the amount of the fine, courts consider:

> (1) the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

> defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;
>
> (2) any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;
>
> (3) the burden that the fine places on the defendant and his dependents relative to alternative punishments;
>
> (4) any restitution or reparation that the defendant has made or is obligated to make;
>
> (5) any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;
>
> (6) whether the defendant previously has been fined for a similar offense;
>
> (7) the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and
>
> (8) any other pertinent equitable considerations.

USSG § 5E1.2(d). The court is not required to articulate specific findings of fact concerning a defendant's ability to pay a fine. *See, e.g., United States v. Quan–Guerra*, 929 F.2d 1425, 1427 (9th Cir. 1991) (looking to evidence in record as a whole in finding that district court considered relevant factors, rather than requiring specific statement of findings). "The amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." USSG § 5E1.2.

The defendant bears the burden of proving indigence. *United States v. Robinson*, 20 F.3d 1030, 1033 (9th Cir. 1994); *see also United States v. Orlando*, 553 F.3d 1235, 1240 (9th Cir. 2009); *United States v. Rafferty*, 911 F.2d 227, 232 (9th Cir. 1990).

Pelayo has not met his burden of showing that he is indigent; he has not provided any evidence that he is indigent. Pelayo refers to an affidavit he submitted in support of his request for his previously retained counsel[1] to be paid by the Court. However, the

---

[1] Andrew Tong testified at trial that he purchased a cashier's check using proceeds from Pelayo to pay for Pelayo's attorney. Consistent with Tong's testimony, Tong's certified bank records show that he purchased a cashier's check payable to Pelayo's counsel in the amount of $50,000. *See* Exhibit A.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

government has not been provided with a copy of this affidavit or given an opportunity to assess its truthfulness, and objects to Pelayo's attempt to use this self-serving statement for purposes of assessing his ability to pay a fine.

Although the PSR indicates that Pelayo's total net worth is approximately $640,950 and Pelayo continues to own his Russian Road property, he has liquidated three of his other real properties:

- In March of 2021, Pelayo sold his residence (3423 68th Avenue NE, Marysville, Washington) for $605,000. *See* Exhibit B (information from Snohomish County Tax Assessor website).[2] Pelayo has not disclosed the disposition of these funds.

- In June of 2019, Pelayo sold another property, which he owned with Jennifer Foulkes (3615 81st Drive NE, Marysville, Washington). *See* Exhibit C. On July 9, 2019, Chicago Title Company issued a check payable to Pelayo on July 9, 2019, for $131,400.54 for "contract of sale payoff." *See* Exhibit D. The check was deposited that same day to the Bank of America account of Pelayo's wife, Vilayvanh Soutavong. *Id.* On July 16, 2019, Soutavong purchased a Bank of America cashier's check for $131,400.54, payable to herself. *Id.* Pelayo has not disclosed the disposition of the proceeds or where the cashier's check was negotiated.

- According to Mohave County property records, Anthony Pelayo purchased 1495 Aztec Cove Drive for $165,000 in December of 2009. The mailing address for the tax assessor was 1902 Broadway, Everett, Washington. Public records do not show any liens filed at the time of purchase, indicating the property was paid for in full. Public records show the property was sold in January of 2020 for $297,000. *See* Exhibit E. Bank records received for Pelayo end in October of 2019, and Pelayo has not disclosed the disposition of these funds.

Additionally, from August 2019 through September of 2021, Pelayo's wife withdrew $79,465, in cash, from her bank accounts, and also cashed a negotiable

---

[2] On June 17, 2019, Tong texted Pelayo, "What u gonna do with that flip house." Pelayo responded, "Well it's suppose to close next week I'm trying to sign papers earlier." Pl. Ex. 963 at p. 15.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

instrument in the amount of $14,067, for a total cash out of $93,532. *See* Exhibit F (summary of transactions); Exhibit G (currency transaction reports and Form 8300). It appears that she may have used $15,000 of these funds to purchase a 2021 Acura TLX in October of 2021; other than that, the disposition of these funds is unknown. *Id.*

**Character Letters**

The letters submitted by the defense show that Pelayo has a supportive family, and for that, he is fortunate. There is no question that his incarceration will be hard on them.

That said, at least one of the letters warrants closer scrutiny in light of Pelayo's flexible relationship with the truth. For example, in June of 2019, while he was in hiding, Pelayo texted his money laundering co-conspirator, Andrew Tong, and asked him for a character reference, explaining that his "goal is to get 100 letters before sentencing." *See* Pl. Ex. 963 at p. 16. When Tong asked what the letter should say, Pelayo texted, "just tell them I'm a good person tell them I was teaching me you how to save and build your credit stuff like that." *Id.* at p. 19. Essentially, Pelayo was encouraging Tong to tell lies of omission about their relationship.

Now, Pelayo has submitted a character reference from Chase Hill, *see* Dkt. 964-2 at p. 10. Pelayo fails to mention that he supplied Hill with pills.[3] Pelayo also neglects to mention that he provided cash drug proceeds to Hill to purchase Pelayo's John Deere tractor and Harley Davidson motorcycle; Hill was simply a straw owner of those assets.[4] Nor has Pelayo mentioned that Hill offered him a place to hide if needed; the day of the

---

[3] For example, in July of 2017, Pelayo texted Hill, "Ok did u ever give those samples out," to which Hill replied, "Ya Timmy was shocked how real they looked he said he was gonna start trying to find some people," and "Chris" said the same. *See* Pl. Ex. 939 (texts between Pelayo and Hill) at p. 23. Pelayo wrote back, "O ya they railed those instantly," to which Hill texted, "Told him to talk to people that sell em out em in packs." *Id.*; *see also id.* at pp. 39-43 (discussing quality of "packs," waiting on the "new stuff").

[4] This is discussed in detail in the government's Motion for Protective Order to Restrain Certain Forfeitable Property, hereby adopted by reference as if fully set forth herein. *See* Dkt. 237 at pp. 29- 31; *see also* Pl. Ex. 939 (texts between Pelayo and Hill) at pp. 3-6 (tractor) and pp. 7- 19, 23-27, 45 (Harley Davidson). Texts between Pelayo and Tong also show that Pelayo was the true owner of the tractor and the Harley. *See, e.g.*, Pl. Ex. 938 at p. 31 ("Wow I just bought a tractor") *et seq.* and p. 38 ("Just got my new bike") *et seq.*



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

first search of Woolard's residence, Hill texted Pelayo, "U guys can stay here if u want pack some shit and get the f outta there." *See* Pl. Ex. 939 at p. 44.

Pelayo submitted his mother's letter to the Court. Dkt. 964-2 at pp. 3-4. It is a sad reflection on Pelayo's character that he previously put his mother in the position of having to lie for him: while Pelayo was in hiding in June of 2019, DEA SA Cheng and SA Smith spoke with Pelayo's mother, who denied knowledge of Pelayo's whereabouts or phone number. Following this contact, Pelayo's mother promptly texted Pelayo, "Guys just left here looking for you. That Asian guy and some big tall white guy.. I said I spoke to u last Tuesday and u don't have a phone." *See* Exhibit H (Pl. Ex. 965 at p. 8). The financial records and text messages between Pelayo and his mother indicate that he leveraged their relationship to launder cash drug proceeds through her business. *See* Dkt. 237 at pp. 41-43.

**Property Held as Evidence**

Rule 41(g) of the Federal Rules of Criminal Procedure requires the return of all property seized by the government except that which is contraband, subject to forfeiture to the United States, or continues to be needed as evidence. *See, e.g., United States v. Van Cauwenberghe*, 934 F.2d 1048, 1061 (9th Cir. 1991). "[W]hen the property in question is no longer needed for evidentiary purposes, either because trial is complete, the defendant has pleaded guilty, or...the government has abandoned its investigation,...[t]he person from whom the property is seized is presumed to have a right to its return, and the government has the burden of demonstrating that it has a legitimate reason to retain the property." *United States v. Martinson*, 809 F.2d 1364, 1369 (9th Cir. 1987). The government's practice is to retain items of potential evidentiary value until one year after all related proceedings and investigations have ended, to reflect the deadline for filing post-conviction challenges under 28 U.S.C. § 2255, an approach that several District Courts have agreed is reasonable. *See United States v. Saldivar*, 2019 WL 6618077, at *1 (E.D. Calif. Dec. 5, 2019) (collecting cases); *see also Fabel v. United*



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*States*, 2020 WL 2873451 at *2 (E.D. Wash. April 17, 2020) (citing *United States v. Mendez*, 860 F.3d 1147, 1150 (8th Cir. 2017)); *Braddy v. Drug Enforcement Agency*, 2021 WL 602832, at *11-12 (C.D. Calif. Jan. 12, 2021); *United States v. Reyes*, 2010 WL 996416, at *1-2 (W.D. Wash. Mar. 15, 2010). Pelayo will doubtless appeal his conviction and, perhaps, file a § 2255 petition. Accordingly, the government has a legitimate reason to retain seized property at this time.

**Unwarranted Sentencing Disparity**

Trafficking fentanyl pills poses a grave danger to the community. In 2020, the United States lost about 93,000 people to overdose deaths—a record. Illegal opioids, including fentanyl, accounted for more than 75% of those deaths. The year 2021 has already set a new, grimmer record: the 12-month death toll has topped 100,000 for the first time. Fentanyl remains the driver of this crisis.[5] Pelayo and Woolard were the vanguard of this crisis in Western Washington.

A 25-years term of imprisonment for Pelayo would not result in unwarranted sentencing disparity. None of Pelayo's codefendants is similarly situated to him, with the sole exception of Bradley Woolard. In fact, Pelayo and Woolard are unlike few defendants this court has likely ever seen, or any defendants in this District. They were like cartel leaders, yet living and operating in Western Washington. They recruited others into the conspiracy. They directed the activities of the many others they brought in, from receiving parcels, sending wires, ordering presses and dies, ordering supplies, and making deliveries. And what Pelayo and Woolard did was far worse than the defendants this court typically sees – mid-level, local dealers who sell a few hundred or few thousand pills at a time: Pelayo and Woolard imported kilograms of pure fentanyl and furanyl fentanyl powder into this District, manufactured millions of imitation

[5] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm; *New York Times*, Overdose Deaths Reached Record High as the Pandemic Spread; CNN, Americans are overdosing on a drug they don't know they're taking; CNN, Drug overdose deaths top 100,000 annually for the first time, driven by fentanyl, CDC data show.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

oxycodone pills in backyard pill presses, and flooded the streets with their homemade concoction. And some courts have sentenced defendants to longer, for less. [6]

[6] The government has recommended similar sentences for only a few drug traffickers in this District. Cristian Berrelleza-Verduzco (WDWA, CR12-62RSL) was the local head of a violent group responsible for distributing significant quantities of heroin in this and other Districts. He had close connections with high-level cartel associates based in Mexico and had been attempting to smuggle firearms from the United States into Mexico. On the eve of trial, Berrelleza-Verduzco pleaded guilty to conspiracy to distribute controlled substances (21 U.S.C. § 841(a)(1), 841(b)(1)(A) and 846), conspiracy to engage in money laundering (18 U.S.C. § 1956(h)), conspiracy to interfere with commerce by robbery (18 U.S.C. § 1951), conspiracy to commit possess firearms in furtherance of drug trafficking (18 U.S.C. § 924(o), and possession of firearms in furtherance of drug trafficking (18 U.S.C. § 924(c)). Dkt. 857. The government recommended 30 years in custody, followed by five years of supervised release. Dkt. 1313. In September of 2014, the Hon. Robert S. Lasnik sentenced Berrelleza-Verduzco to 27 years in custody, followed by five years of supervised release. Dkt. 1316-1317; *see Berrelleza-Verduzco v. United States*, 2016 WL 1168366 (W.D. Wash. Nov. 22, 2016) (denying 28 U.S.C. § 2255 petition).

Clay Roueche (WDWA, CR07-344RSL) founded and led the Canadian-based "UN gang." Roueche oversaw the movement of tens of thousands of pounds of marijuana, thousands of kilograms of cocaine, and millions of U.S. dollars. Dkt. 333. Roueche pleaded guilty to conspiracy to export cocaine (21 U.S.C. §§ 953, 960(a)(1), 960(b)(1)(B) and 846), conspiracy to import marijuana (21 U.S.C. §§ 953, 960(a)(1)(b)(1)(G) and 963), and conspiracy to engage in money laundering (18 U.S.C. § 1956(h)). Dkt. 257. The government recommended a 30-year sentence of imprisonment and five years of supervised release. Dkt. 333. In December of 2009, the Hon. Robert S. Lasnik sentenced Roueche to 30 years in custody, followed by five years of supervised release. Dkt. 352-353. The Court of Appeals for the Ninth Circuit remanded the case for resentencing, directing the Court to identify and rule on specific factual objections or make express its disavowal of that information. Dkt. 380. At resentencing in February of 2011, the government make the same sentencing recommendation (Dkt. 383, 386), and the Court imposed the same sentence. Dkt. 387-388. An amendment to the Sentencing Guidelines later reduced Roueche's base offense level from 38 to 36, and his Guidelines range from 262-324 months; the Court re-sentenced Roueche to 288 months (24 years), the approximate mid-point of his new range. Dkt. 414-415.

In *United States v. Hall*, 829 Fed. Appx. 699, 709-11 (6th Cir. 2020), the Sixth Circuit upheld a 444-month sentence for fentanyl and weapons offenses, noting that the within-Guidelines sentence was presumptively reasonable. The *Hall* court also rejected the defendant's "trial penalty" argument, explaining that the government's decision to seek a sentence within Guidelines range of 360 months to life was not retaliation for the defendant exercising his Sixth Amendment right to trial. *Hall*, 829 Fed. Appx. 699, at 710. The *Hall* court noted that the government had offered a favorable plea deal to the defendant in part to protect the identity of confidential informants and avoid having them testify. *Id.* Similarly, in the instant case, each of the six cooperators who testified at trial is at varying degrees of risk, due to their names and faces being made public.

*See also Acuna v. United States*, 2016 WL 3747531, at *1 (D. Hawai'i July 8, 2016) (noting that 32-year sentences for defendants convicted at trial of conspiring to transport thousands of pounds of methamphetamine from Mexico, to Las Vegas, and then to Oahu, were affirmed).

The Ninth Circuit has repeatedly held that the mere imposition of a heavier sentence after a defendant rejects a plea bargain and is convicted at trial does not invalidate the sentence; when a defendant voluntarily choses to reject or withdraw from a plea bargain, he retains no right to the rejected sentence. *See United States v. Vasquez-Landaver*, 527 F.3d 798, 805-06 (9th Cir. 2008); *see also United States v. Pacheco*, 829 Fed. Appx. 207, 211 (9th Cir. 2020) (upholding 19-year sentence following conviction at trial, notwithstanding defendant's rejection of a six-year

(continued . . .)



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Pelayo and Woolard did not care anything about the people who consumed their potentially deadly pills, or the community. As demonstrated in the government's closing argument, when Pelayo learned that one of his fentanyl packages had been delayed because a young woman had been rushed to Harborview for vomiting blood, Pelayo responded, "She better not of opened it and took a bump . . ." Pelayo cared nothing about others. He cared only about the extraordinary profits he was earning. "I'll never quit."

Indeed, there is no defendant like Anthony Pelayo, except for Bradley Woolard.

Dated this 22nd day of November 2021.

Respectfully submitted,

NICHOLAS W. BROWN
United States Attorney

/s/ *Karyn S. Johnson for*
KARYN S. JOHNSON
MIKE LANG
Assistant United States Attorneys
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Telephone: (206) 553-7970

---

plea offer; court made no comment at sentencing about defendant's decision to go to trial); *United States v. Ramos-Lopez*, 349 Fed. Appx. 166, 168 (9th Cir. 2009) (no evidence that sentence was based on desire to penalize defendant for exercising his jury trial right); *United States v. Gaines*, 200 Fed. Appx. 707 (9th Cir. 2006) (consecutive sentences totaling 182 years' imprisonment, imposed upon defendant convicted by a jury of eight counts of use of a firearm during commission of a crime of violence, after rejecting plea offer calling for 25-year sentence, did not amount to judicial vindictiveness or punishment for defendant's exercise of his constitutional right to trial; sentencing court did not participate in plea negotiations and expressed concern with respect to defendant's potential sentencing exposure during pretrial conference, and consecutive sentences were mandated by statute).

As the parties well know and appreciate, this Court *volunteered* to preside over trial in this case, despite the COVID-19 pandemic. The government is confident that the Court will not penalize any of the defendants for exercising their Sixth Amendment right to trial.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970